[646 NYS2d 665]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v TERRENCE WILLIAMS, Respondent.

First Department, July 25, 1996

### APPEARANCES OF COUNSEL

*Stuart P. Levy* of counsel, Bronx *(Joseph N. Ferdenzi* and *Billie Manning* on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for appellant.

*Kimberlianne Podlas* of counsel, New York City *(Daniel L. Greenberg,* attorney), for respondent.

### OPINION OF THE COURT

MILONAS, J. P.

In this assault case, the People appeal from the hearing court's suppression of any identification of defendant by the victim, following an independent source hearing and suppression of a precinct showup.

Defendant was charged with stabbing the victim as she waited for the elevator in her apartment building one night. For reasons that are not entirely clear, defendant was brought to the precinct the following night as a possible suspect. Officer Robert waited with defendant in a back room while Officer Nelan picked up the victim and brought her to the precinct; on the way, Nelan told her that they "might have somebody who did the stabbing." At the precinct, Officer Nelan left the victim seated in the waiting area while he walked toward the back room. Suddenly, Officer Robert came out of the room, and defendant walked out behind him; upon seeing defendant, the victim blurted out that he was the man who had stabbed her. Defendant was not in handcuffs or otherwise restrained at the time.

The hearing court suppressed this identification as the result of a suggestive showup, which he criticized as "a horrendous thing" that should never have taken place. The People then proceeded to an independent source hearing at which the victim testified, in order to show a source other than the showup for the victim's proposed in-court identification of defendant at trial. During her testimony, defendant absented himself from the courtroom.

The victim, a woman in her thirties, testified that she encountered defendant suddenly when she turned around while waiting for the elevator. In the well-lit hallway, she found herself "face-to-face" with him as he pulled her to him and tried to kiss her; he was only "inches" away from her face. He told her "come here bitch," and, although she tried to push him away, he dragged her 20 or 30 feet toward the exit. Finally, as she tried to pull back and kick him, she fell to the ground.

He grabbed her again, and, while on top of her on the floor, he pulled out a knife and began to stab her. Pleading with him to stop, saying "why are you doing this, why are you trying to kill me," she continued to look at him so that she could anticipate where the knife would fall and try to block it; she was afraid that he would stab her in the chest and she would die. He stopped suddenly and fled down the stairway. The entire incident lasted two to three minutes, during which time the victim "never" took her eyes off him. Although she called for help during the attack, there was loud music coming from one of the apartments on the floor, and no one responded to her cries. Despite stab wounds to her arm and thigh, she managed to get back to her apartment and called 911.

The victim described her assailant as a tall male black, just a "shade lighter" than herself; he was approximately 6 feet or 6 feet, 2 inches with a "very, very thin mustache;" he had a very short haircut and was wearing a light brown, matching two-piece jogging or sweat suit and a black backpack. He weighed approximately 180 pounds. According to the victim, this was the description she gave to the police that night, although Officer Nelan testified that she said the attacker was 6 feet 2 inches or 6 feet, 3 inches, weighing approximately 160 pounds. She also described the knife in detail.

The defendant testified about the precinct showup. He also described himself as 6 feet, 5 inches and 225 pounds; in 1992, he said, he weighed approximately 200 pounds. Defense counsel pointed out that defendant had "a little bit of facial hair" on his chin; according to defendant he had this chin hair (what the court later called a goatee) as well as a mustache in 1992. Counsel also noted for the record a four-inch scar on the lower portion of defendant's right cheek, dating from when defendant was 10 years old. Without objection, the prosecutor described this for the record as a "very light" scar.

After oral argument, the court prefaced its decision by noting that all three witnesses had been credible. The court found, however, that the showup was so "egregious that it fatally taints the ability of the complainant to identify the perpetrator." According to the court, the "illegal police conduct" in detaining defendant without probable cause "so adversely affected the case" that suppression was mandated. At the same time that it made repeated references to the victim's credibility, the court noted discrepancies between her description of the assailant and defendant's appearance with respect to height and facial hair. Despite the court's conclusion that it

must suppress all identification due to the extent of police misconduct, its comments also suggested that it had found the existence of an independent source of the victim's identification. In fact, it seemed to make an affirmative finding to this effect immediately after she testified.

Because of this apparent inherent conflict in the court's decision, and in order to determine whether to pursue an appeal, the prosecutor sought a clarification of the court's holding some weeks after the hearing and decision. When the parties appeared for this "clarification," the court agreed that the minutes of its decision were unclear and that it had either misspoken or been misunderstood by the court stenographer. The court then explained that, as a matter of law, it did not (and had not meant to) find that there was an independent source of identification based on the victim's recollection of the incident. The court attributed her recollection and certainty not to the incident itself but to the illegal showup, and noted discrepancies with respect to defendant's weight and facial scar. The court also referred to the victim's mental state at the time of the attack ("the terrors that she was undergoing") and deemed the conditions under which she saw her attacker as "necessarily dimly lit."

Thereafter, in a written decision issued several months later, the court reiterated that the victim had been a credible witness with a "good recollection" and "the ability to make an accurate identification." In the court's view, however, that ability was "tainted" by the showup, as would be any in-court identification, which the court therefore suppressed. The court went on to say that even if it found that the victim's recollection was wholly independent of the showup—which it explicitly did not find—it would nevertheless be "constrained" to suppress any and all identifications as "fruit of the poisonous tree" of the illegal arrest.

Where a suggestive identification procedure has been suppressed, an in-court identification may nonetheless be permitted where it can be shown that the proposed identification is based on the witness's independent recollection of the incident itself and not on the suggestive procedure (*see, People v Adams*, 53 NY2d 241, 251; *People v Rahming*, 26 NY2d 411, 416). Moreover, where the identification arises from such recollection independent of the suggestive procedure, it need not be suppressed because of any unlawful seizure or detention such as was alleged and found by the hearing court (*United States v Crews*, 445 US 463; *People v Pleasant*, 54 NY2d 972, 973, *cert*

*denied* 455 US 924; *People v Davis*, 141 AD2d 558, 559, *lv denied* 73 NY2d 786).

In this case, the court's determination · upon conducting an independent source hearing was plainly contrary to the weight of the evidence (*People v Bratton*, 133 AD2d 408, 411, *lv denied* 70 NY2d 798; *People v Garafolo*, 44 AD2d 86, 88), as well as based on a misapprehension of the applicable law. We find that the victim's testimony clearly demonstrated that she had a vivid, detailed recollection of her assailant based on her recollection of the incident itself, not on the inadvertent showup the following day. Accepting the court's determination that the precinct showup was unduly suggestive and should be suppressed, which we must because the People chose not to pursue this issue on appeal, we find that the People sustained its burden of showing by clear and convincing evidence that there was an independent source for an in-court identification (*People v Chipp*, 75 NY2d 327, 335, *cert denied* 498 US 833).

In concluding that an independent source exists, and that it outweighs the taint of a suggestive identification, we have considered the following factors enumerated in *Neil v Biggers* (409 US 188, 199-200): the victim's opportunity to observe her assailant during the crime itself; her degree of attention; the accuracy of her prior description; the degree of certainty in her prior identification; and the lapse of time between the crime and the identification.

The victim, a security receptionist who described her job as one that involves "identifying people" who come to her place of employment, observed her attacker at close range without obstruction in a well-lit hallway for several uninterrupted minutes, during which time she maintained constant eye contact. Indeed, any discrepancies between her description and defendant's appearance may well be due to the fact·that she viewed her assailant from such close range rather than at any appreciable distance. Her opportunity to observe was excellent, her attention riveted on defendant. We are at a loss to explain the hearing court's reference to a "necessarily dimly lit hallway" in its clarification of its findings, when both the victim and Officer Nelan testified that the hall was well lit, and when the court itself cited the "excellent lighting conditions" after the victim's testimony. Also, although the court seemed to dismiss two to three minutes as only a "brief" opportunity for observation, such opportunity may be more than sufficient for identification purposes (*People v Santos*, 202 AD2d 258, 259, *lv denied* 83 NY2d 1007); indeed even a matter of a

few seconds may suffice for independent source purposes (*People v Hyatt*, 162 AD2d 713, 714, *lv denied* 76 NY2d 987).

Similarly, although the victim said that she was, of course, "scared" during the attack, there is no basis in the record for the court's conclusion that she was suffering such "terrors" as to significantly impede her powers of observation. Indeed, her very words to her assailant, cited above, evince a surprising presence of mind under the circumstances, and Officer Nelan remarked that even when he responded to the 911 call, not long after the incident, she was "very coherent."

The victim's description was remarkably detailed and accurate. Although there was no testimony other than from defendant himself as to his appearance at the time of his arrest (no arrest photograph or police testimony), any discrepancies, such as they were, between the victim's description and the defendant's own were hardly significant. Finally, the victim was certain of her spontaneous identification at the precinct ("that's the person that stabbed me"), which occurred inadvertently and without prompting or inquiry on the part of the police, only 24 hours after the stabbing. Indeed, the officer who preceded the defendant out of the back room at the precinct was unknown to the victim, and she would have had no reason to expect to see her assailant with him, as opposed to one of the officers with whom she had spoken the previous night. That 24 hours elapsed between the attack and the identification does not militate against the certainty and credibility of her identification, since her recollection of the attack could hardly have begun to fade in so short a time. While this is not an instance where a showup occurred moments after the crime, it is hardly comparable to a 14-month lapse between the crime and the suggestive identification procedure in *People v Foster* (200 AD2d 196, 203, n 6, *lv withdrawn* 83 NY2d 1003).

Interestingly, our findings with respect to the *Biggers* factors seem to be mirrored by the court's own words after the hearing, when it stated that the victim "was a very certain witness. She was very confident that she remembered the face of the perpetrator and she was a very credible witness. She had him in close proximity for two or three minutes, actually eye-to-eye, and her level of certainty appeared unwaivering." Nonetheless the court felt constrained, apparently based on its finding of defendant's illegal detention, to suppress all identification. That it felt so constrained is, of course, borne out by its explicit finding to this effect in its written decision. As discussed above, such illegal detention does not compel this

result (*United States v Crews, supra*; *People v Pleasant, supra*; *see also, People v Young*, 55 NY2d 419, *cert denied* 459 US 848).

The prosecution and defense go to some lengths disputing what the court said and meant when it initially rendered its findings after the hearing, in contrast to what the court said it meant at the "clarification" almost two months later, and, finally, what it held in its written decision some three months after that. While the apparent conflict between the original findings and the subsequent clarification and written decision is confusing and even inexplicable, we find that the record clearly demonstrates the existence of an independent source for the victim's in-court identification of defendant at trial. Whether the court's remarks were mistranscribed to reflect the very opposite of what it actually said, whether the court misspoke, or whether the court simply changed its mind to conform its legal and factual findings (based on a misapprehension of the consequences of an illegal detention), its ultimate conclusion—which is the issue on appeal—was contrary to the weight of the evidence.

We note that once the hearing court suppressed all identification, it deemed the defense application for *Rosario* sanctions regarding a missing 911 tape and an unproduced memobook moot. In light of our decision that the in-court identification should not be suppressed, the court must now address this issue.

Accordingly, the order of the Supreme Court, Bronx County (John Stackhouse, J.), entered February 15, 1995, which granted defendant's motion to suppress identification testimony based on the lack of an independent source, is unanimously reversed, on the law and the facts, the motion to suppress the victim's in-court identification testimony is denied, and the matter remanded for further proceedings.

WALLACH, RUBIN, KUPFERMAN and MAZZARELLI, JJ., concur.

Order, Supreme Court, Bronx County, entered February 15, 1995, reversed, on the law and the facts, the motion to suppress the victim's in-court identification testimony denied, and the matter remanded for further proceedings.