People v Santiago (2019 NY Slip Op 04897)





People v Santiago


2019 NY Slip Op 04897


Decided on June 18, 2019


Appellate Division, First Department


Tom, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 18, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick, J.P.
Sallie Manzanet-Daniels
Peter Tom
Ellen Gesmer,JJ.


643/10 8614 

[*1]The People of the State of New York, Respondent,
v
Kareem Santiago, Defendant-Appellant.



Defendant appeals from a judgment of the Supreme Court,
New York County (Marcy Kahn, J. at independent source hearing; Roger S. Hayes, J. at jury trial and sentencing), rendered September 22, 2016, convicting defendant of criminal possession of stolen property in the fourth degree, and imposing sentence.




Robert S. Dean, Center for Appellate Litigation, New York (Mark W. Zeno of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Julia P. Cohen and Grace Vee of counsel), for respondent.



TOM, J.


In this case we are tasked with determining whether the record supports defendant's conviction on a theory of constructive possession of stolen property recovered from a location where he had only a transient, yet indisputable, presence in the company of two other suspects, notwithstanding that he was not convicted of the underlying robbery.
The victim testified that she was returning from work between 12:30 and 1 a.m. on February 6, 2015. After exiting the subway station at 86th Street, she walked north and turned left onto West 90th Street. As she passed Amsterdam Avenue, a young man suddenly approached her, grabbed her left arm and punched her, causing her to fall. The assailant attempted to pull her purse off of her shoulder. At the same time, two other young men appeared; one kicked her while the other one, later identified as defendant, stood close by. The area was well lit, and the victim had a clear and unobstructed view of the perpetrators, including their faces. After the men beat the victim, the initial assailant wrested away her pocketbook, and [*2]all three men fled together towards Columbus Avenue. The victim immediately entered the nearby building where she lived, and the concierge called the police.
Sergeant Laquidara responded with Lieutenant Lavin to the vicinity of 90th Street between Columbus and Amsterdam Avenues at shortly after 1 a.m. pursuant to the 911 call. Testimony by responding officers described a parking garage on 90th Street that ran through to 91st Street and had a park over its roof. The car entrance to the garage was on 90th Street, and a pedestrian entrance was adjacent to the park on 91st Street, which was at a higher elevation than 90th Street. Sergeant Laquidara testified that as the officers searched under benches and generally around the rooftop park, they approached a gate that opened on to a staircase that descended into the garage. As they did so, Sergeant Laquidara saw three heads pop up by the staircase. One of them exclaimed, "Oh s—t; the cops," as a marked police vehicle passed by. The officers immediately lowered themselves to the ground. As the police car passed, the three men retreated down the staircase. There was nowhere for them to go except through a door at the bottom.
Sergeant Laquidara drove his vehicle around the block to the vehicle entrance to the garage to ensure that no one entered or exited from that location, as Lieutenant Lavin went down the staircase. Aside from this entrance and the door at the bottom of the staircase, there was no other way into or out of the garage. When Sergeant Laquidara entered the garage, he observed only two doors, one to the staircase and the other to a locked room. He recovered an open blue pocketbook matching the description of the victim's stolen pocketbook from on top of a trash can outside of the locked door. The police department's Emergency Services Unit soon forced open the locked door, inside of which was a small boiler room. Three men were found inside. Defendant and one other man had been hiding in a "hole" about three feet deep and about three feet by three feet wide that had been covered by a grate. Defendant and his companion, when removed, were described by Laquidara as "filthy" and "oily." Detective King testified that he and his partner had been canvassing the neighborhood with the victim when they proceeded to the garage. Detective King observed the blue pocketbook as the ESU arrived. No civilians entered or exited the garage. Detective King entered the boiler room behind the ESU officers. He took possession of the first person taken into custody, after which two more men, covered in dirt and ash, were removed from the room. Detective King identified defendant in court as one of the two men. Detective Christopher Mitchell also testified that after ESU officers forced open the door to the locked room, he entered, and, after the first man was escorted from the room, he observed defendant, who was flailing his arms as police reached for him, and another man crouching in the three-foot-deep hole.
After the men were removed from the room, the officers looked inside for evidence. Detective Mitchell observed two sets of keys, two cell phones and a handgun on a ledge of the boiler. While still inside the room, another officer handed him a debit card bearing the victim's name. Although Detective Mitchell did not know where inside the room the debit card had been picked up, he was certain on cross-examination that it was found inside the locked boiler room where defendant had been hiding.
Initially, the People established, by clear and convincing evidence, that the victim had a basis for her in-court identification of defendant independent of a previously suppressed showup procedure. A number of factors support the independent source finding (see Manson v Brathwaite, 432 US 98, 114 [1977]; People v Williams, 222 AD2d 149, 152-153 [1st Dept 1996], lv denied 88 NY2d 1072 [1996]), even when viewed in the light of modern scientific knowledge regarding identifications. The victim had an unobstructed view of defendant and the other two perpetrators, under good lighting, at close range, and had sufficient time to observe them while she was being attacked. Her attention was focused on the perpetrators, she gave accurate general descriptions of the three men, and she also recalled particularized identifying characteristics [*3]relating to their sizes and builds. Furthermore, the victim, who had rejected two other separate groups of people pointed out by the police during their canvass of the area, immediately recognized defendant and his codefendants.
Defendant's legal sufficiency claim is unpreserved, and we decline to review it in the interest of justice. As an alternative holding, we reject it on the merits. We also find that the verdict was not against the weight of the evidence (see People v Danielson, 9 NY3d 342, 348-349 [2007]). The evidence and reasonable inferences to be drawn therefrom established defendant's joint constructive possession of the victim's debit card, together with the codefendants (People v Manini, 79 NY2d 561, 573 [1992]; see Penal Law 10.00[8]). Defendant's acquittal of robbery does not warrant a different conclusion (see People v Rayam, 94 NY2d 557 [2000]; People v Chandler, 104 AD3d 618, 619 [1st Dept 2013], lv denied 21 NY3d 1002 [2013]).
On appeal, defendant speculates that the stolen debit card was not recovered from the boiler room, and he contends that there is no evidentiary basis on which to impute to him criminal possession of it. Defendant also relies on his acquittal of the robbery to exonerate him of possessing the fruits of the robbery. However, we find no reasonable basis in the record for speculating that the victim's debit card might have been recovered from some other location with which defendant had no nexus. Police testimony made clear that the stolen debit card was in the boiler room, simultaneous with defendant's apprehension. The evidence is also indisputable that defendant was a participant in the activity that led to the stolen property being constructively possessed by all three codefendants.
The victim's testimony established that defendant was with the other two men as they beat and robbed her, even if he did not directly contribute to the violence, and that he fled with them. The record elsewhere established that defendant remained with them as they tried to avoid detection by police when, shortly after the robbery, they were outside of the garage, which was in the immediate vicinity of the robbery location, and that the suspects attempted to escape detection by entering the garage. Police testimony made it clear that defendant and his companions were tracked as they entered the garage, which no one else entered during the relevant time period, and from which they had no means of egress that could not be observed by responding police. The victim's open pocketbook effectively functioned as a beacon directing police attention to the locked room. In order to gain access, the ESU had to basically break down the door. Defendant's presence, his hiding in an oily sump pit inside with the two robbers, and his attempt to physically resist detention compel the conclusion that defendant manifested a consciousness of guilt. Police testimony thus clearly established that defendant had been a participant in the criminal venture and that he exercised dominion and control over the room where the perpetrators were essentially trapped in close proximity to the stolen property, and thereby exercised dominion and control over, and thus joint constructive possession of, the property itself.
In any event, the jury was presented with this evidence, there was no conflicting evidence addressing the recovery of the stolen evidence, and the jurors had ample opportunity to evaluate the officers' credibility. In performing our weight-of-the-evidence review, we decline to "take the place of the jury in passing on questions of the reliability of witnesses and credibility of testimony" (People v Griffin, 63 AD3d 635, 638 [1st Dept 2009], lv denied 13 NY3d 835 [2009]); the jury's findings on these questions must be accorded "[g]reat deference" (People v Romero, 7 NY3d 633, 645 [2006]). We find no reason on this record to disturb the jury's verdict.
Accordingly, the judgment of the Supreme Court, New York County (Marcy Kahn, J. at independent source hearing; Roger S. Hayes, J. at jury trial and sentencing), rendered September 22, 2016, convicting defendant of criminal possession of stolen
property in the fourth degree, and sentencing him to a term of one year, should be affirmed.
All concur.
Judgment Supreme Court, New York County (Marcy Kahn, J. at independent source hearing; Roger S. Hayes, J. at jury trial and sentencing), rendered September 22, 2016, affirmed.
Opinion by Tom, J. All concur.
Renwick, J.P., Manzanet-Daniels, Tom, Gesmer, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JUNE 18, 2019
CLERK