**Luders MASSILLON, Petitioner,**

v.

**James CONWAY, Acting Superintendent of Attica Correctional Facility, and Andrew M. Cuomo, Attorney General of New York,[1] Respondents.**

**No. 03 Civ. 3445(SHS)(THK).**

United States District Court, S.D. New York.

Aug. 5, 2008.

1. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Attorney General Andrew M. Cuomo is automatically substituted for former Attorney General Elliot Spitzer.

· Nancy E. Little, Esq., The Legal Aid Society, Criminal Appeals Bureau, Kew Gardens, NY.

Luke Martland, Esq., Attorney General of the State of New York, New York, NY.

## ORDER

SIDNEY H. STEIN, District Judge.

In a Report and Recommendation, Magistrate Judge Theodore H. Katz has recommended that the petition of Luders Massillon for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 be granted. After a *de novo* review of that Report and consideration of defendants' objections, the Court adopts the Report and Recommendation with the following modification.

■ In assessing whether petitioner was prejudiced by the ineffective assistance of his trial counsel, *see Strickland v. Washington*, 466 U.S. 668, 691–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Magistrate Judge Katz applied the factors set forth in *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), in order to determine whether Detective Trigueno's and Officer Williams's in-court identifications were independent of petitioner's unlawful arrest. This Court finds it more likely that New York courts would apply the analysis set forth in *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), because the question presented in that case, as in this one, was whether a witness's in-court identification was independent of an out-of-court identification that had been excluded as the fruit of an arrest without probable cause. 445 U.S. at 467–68, 100 S.Ct. 1244; *see People v. Gethers*, 86 N.Y.2d 159, 163, 654 N.E.2d 102, 630 N.Y.S.2d 281 (1995) (citing *Crews* as providing the standard for determining the admissibility of an in-court identification where an out-of-court identification has been suppressed as the

fruit of an arrest without probable cause); *People v. Brnja*, 50 N.Y.2d 366, 406 N.E.2d 1066, 429 N.Y.S.2d 173 (1980) (same).

■ In *Crews*, 445 U.S. at 473 n. 18, 100 S.Ct. 1244, the U.S. Supreme Court applied the factors set forth in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), in determining whether an in-court identification had an independent source:

[1] the prior opportunity to observe the alleged criminal act, [2] the existence of any discrepancy between any pre-lineup description and the defendant's actual description, [3] any identification prior to lineup of another person, [4] the identification by picture of the defendant prior to the lineup, [5] failure to identify the defendant on a prior occasion, and [6] the lapse of time between the alleged act and the lineup identification.

388 U.S. at 241, 87 S.Ct. 1926. Although these factors are not identical to those in *Biggers*, there is clearly substantial overlap between them.[2] Moreover, the Supreme Court in *Crews* also cited *Biggers*, which suggests that the two analyses are indeed closely related.[3] *See* 445 U.S. at 473 n. 18, 100 S.Ct. 1244. The distinction is somewhat academic because this Court finds that an analysis pursuant to *Crews* leads to the same conclusion that Magistrate Judge Katz reached pursuant to *Biggers*; namely, that "if the in-court identifications had been challenged by defense counsel, it is probable that the prosecution would not have been able to meet its burden of proving admissibility by clear and convincing evidence." (Report and Recommendation at 405.)

---

**2.** The first, second, and sixth of the *Wade* factors correspond to the first, third, and fifth *Biggers* factors, respectively. *See Biggers*, 409 U.S. at 199–200, 93 S.Ct. 375.

**3.** In *Biggers*, the Supreme Court considered whether a witness's identification of her assailant was reliable notwithstanding an impermissibly suggestive show-up procedure. 409 U.S. at 196, 200–01, 93 S.Ct. 375.

Moreover, even if the in-court identifications had been admitted as independent of the out-of-court confirmatory identifications, there is still a reasonable probability that the outcome of petitioner's trial would have been different without testimony regarding the out-of-court identifications. Without that testimony, defense counsel would have had significantly greater opportunity to cross examine Detective Trigueno and Officer Williams regarding their recollections of petitioner, given that the trial occurred almost one full year after petitioner's arrest and both officers testified that they had engaged in over one hundred similar "buy-and-bust" operations since that time. (Trigueno Tr. 61–62; Williams Tr. 99.) With or without the in-court identifications, the evidence of petitioner's guilt, absent the out-of-court confirmatory identifications, is extremely thin. This Court finds that there is a reasonable probability that the outcome of the trial would have been different if the out-of-court confirmatory identifications had not been admitted but the in-court identifications had been.

Accordingly, after a *de novo* review of Magistrate Judge Theodore H. Katz's Report and Recommendation dated May 1, 2006, and defendants' objections dated June 15, 2006, IT IS HEREBY ORDERED THAT

1. Magistrate Judge Katz's Report and Recommendation, as modified, is adopted; and

2. The petition pursuant to 28 U.S.C. § 2254 is granted.

SO ORDERED:

## REPORT AND RECOMMENDATION

THEODORE H. KATZ, United States Magistrate Judge.

This habeas corpus proceeding was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Local Civil Rule 72.1(d) of the Southern District of New York.

Petitioner, a New York State prisoner incarcerated at Attica Correctional Facility, was convicted of Criminal Sale of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.39(1). He seeks habeas relief pursuant to 28 U.S.C. § 2254, claiming that he was denied effective assistance of counsel when, after a pretrial determination that Petitioner had been arrested without probable cause, defense counsel failed to move to suppress the subsequent confirmatory identifications. Respondents contend that the Petition should be dismissed because Petitioner received effective assistance of counsel that was well within constitutional standards. For the reasons set forth below, the Court respectfully recommends that the Petition be granted.

## BACKGROUND

Petitioner's conviction stems from a November 2, 1996 police "buy and bust" operation in Manhattan, targeting crack cocaine. During the operation, undercover officers transmitted the seller's description to the operation's arrest team. Based upon that description, a member of the team stopped, arrested, and searched Petitioner. The officer recovered crack cocaine and $44 in cash, but failed to recover any of the pre-recorded buy money that had been used by the undercover officer to make the drug buy. After Petitioner was arrested, two undercover officers confirmed that Petitioner was the man who had sold the crack cocaine.

### I. *The Suppression Hearing*

Prior to trial, defense counsel moved for suppression of the physical evidence obtained from Petitioner, asserting that it was the fruit of an unlawful arrest. De-

fense counsel also requested a hearing on the voluntariness of a statement Petitioner made to the police as he was stopped on the street. Counsel did not move to suppress the confirmatory identifications made by the two officers or any potential in-court identifications.

On October 8, 1997, a suppression hearing was held in New York State Supreme Court, New York County (Shea, J.). At the hearing, Detective Marvin Hernandez ("Hernandez") testified that he was the arresting officer for that day's "buy and bust" operation. (*See* Suppression Hearing Transcript, Oct. 8, 1997 ("Suppression Tr."), at 7.) Hernandez testified that Officers 5543 and 4359 were the undercover officers for the operation, and other members of the operation included a sergeant and field team. (*See id.* at 6–9.)

At approximately 11:05 A.M. on November 2, 1996, Hernandez, driving down Broadway in Manhattan, received a transmission from undercover Officer 5543. (*See id.* at 11.) The undercover officer stated that there had been a "positive buy," gave descriptions of a seller as well as a buyer, and indicated a location of 90th Street and Amsterdam Avenue and the direction in which both men were walking. (*See id.* at 11, 13, 15, 28.) The description of the seller was of a male wearing a green coat and black pants. (*See id.* at 12–13, 30–31.) Hernandez did not remember if the description included the seller's race. (*See id.* at 12.) Hernandez testified that the description given of the buyer was of a black male, also wearing a green coat and black pants. (*See id.* at 12–13, 30–31.)

Hernandez said that he responded to the vicinity of 90th Street and Amsterdam Avenue, and about five minutes after the transmissions he arrested the person he believed to be the buyer, on 88th Street near Broadway. (*See id.* at 13, 32.) When the court asked how Hernandez knew it was the buyer, Hernandez explained that he fit the description. (*See id.* at 14.) Noting that Hernandez gave the same description for the buyer and seller, the court questioned how he could distinguish them. (*See id.*) Hernandez then altered his testimony and stated that the seller was wearing blue jeans and the buyer was wearing black jeans. (*See id.* at 14–15.) Hernandez explained that the radio transmission had also indicated that the buyer was walking in a southerly direction from 90th Street. (*See id.* at 16.)

A few minutes later, after arresting and searching the buyer, Hernandez testified that he received a second transmission from undercover Officer 4359, who was acting as a "ghost" for the "buy and bust" operation. (*See id.* at 17, 42.) She radioed that she saw the seller at West End Avenue and 90th Street. (*See id.* at 17.) After driving down West End Avenue and turning west onto 90th Street, Hernandez testified that he saw Petitioner, wearing a green coat and blue jeans, walking on the south side of 90th Street. (*See id.* at 17–19.) No one else was on that residential street. (*See id.* at 18.) Without asking Petitioner any questions, Hernandez and another member of the arrest team approached Petitioner, then stopped, handcuffed, and searched Petitioner, only a minute or so after the undercover officer's transmission. (*See id.* at 19, 25, 39–40.) Hernandez recovered from Petitioner "two small rolled up tins of foil" containing crack-cocaine, a piece of paper that appeared to be a matchbook cover containing crack-cocaine, and $44. (*See id.* at 21–24.) This search of Petitioner took place before any confirmatory identification. (*See id.* at 23.) Hernandez also testified to a statement made by Petitioner. Hernandez testified,

> As I was approaching the defendant I said "police." Once I put my hand on the defendant to stop him, the defendant started screaming and screaming and

moving around saying, "I can't go back. I can't go back." And he threw himself to the ground. (*Id.* at 25.)

Hernandez testified that he then walked Petitioner toward the southwest corner of 90th Street and West End Avenue for identification. (*See id.* at 22, 25.) A minute or two after placing Petitioner under arrest, Hernandez stated that he received a transmission from one of the undercover officers, indicating a "confirmatory identification." (*See id.* at 21–22.)

On cross-examination, Hernandez reiterated that there were no other details in the description of the seller other than that he was male and was wearing a green coat and blue jeans. (*See id.* at 29–30.) There was nothing in the radioed description that Hernandez could recall about the man's race, the color of his skin, his age, his height, his weight, or the type or length of the jacket he was wearing or its shade of green. (*See id.* at 30, 36–37.) Hernandez also corrected his testimony, stating that he drove to 93rd Street, not 90th Street, where he arrested Petitioner. (*See id.* at 38–39.)

On re-direct examination, Hernandez testified that he was not saying that he did not have any more descriptive information when he stopped Petitioner, but rather, that he did not recall whether he did. (*See id.* at 43–45.) After his recollection was refreshed with a "buy report," Hernandez testified that Petitioner was wearing a baseball cap. Asked if that was communicated to him by the undercover officer prior to the arrest, Hernandez said "yes." (*Id.* at 46–47.)

On re-cross examination, Hernandez repeated that he remembered Petitioner wearing a baseball cap when he stopped him. (*See id.* at 50–51.) The court then questioned him:

The Court: Wait a second. What do you remember? You remember the description given to you was a baseball cap?

Hernandez: No, I remember the baseball cap. I don't recall that the undercover—I can't recall that the undercover described the baseball cap but I remember when I arrested him he had the baseball cap.

(*Id.* at 51.)

At the conclusion of the hearing, defense counsel moved to suppress the physical evidence seized from Petitioner, as well as any statements he made. (*See id.* at 52–53.) Defense counsel argued that the limited description of the seller was an insufficient basis on which to arrest and search Petitioner several minutes after, and several blocks from where, the sale allegedly occurred. (*See id.* at 53–55.)

The prosecutor contended that the issue was "whether or not that search was made incident to a lawful arrest, simply speaking, whether or not the officer has probable cause to make that arrest." (*Id.* at 56.) The prosecutor maintained that the description of the seller, coupled with the transmission by undercover Officer 4359 that she had seen the seller at West End Avenue and 93rd Street, was "enough for [Hernandez] to have probable cause, certainly reasonable suspicion to approach the defendant and to stop him and then to make the arrest." (*Id.* at 59.)

The hearing court reviewed Hernandez's testimony, and concluded that Hernandez had "a great deal of difficulty in remembering what happened. He contradicted himself on several occasions. He was unsure what had happened. And I find it very difficult to credit his version of events." (*Id.* at 61.) The court noted the inconsistencies in his testimony, his confusion over the descriptions given and the locations involved, and the scantness of the description given by the undercover offi-

cers. (*See id.* at 61–65.) The court held that the search was illegal, stating,

> Identification was made. The officer's information was sketchy. The arrest was made several blocks from the place where the arresting officer told Detective Hernandez that the buy had been made. The description of a male wearing a green coat and blue jeans is very general, fitting a lot of people. There was no testimony anybody else was around that might have fit that description and the testimony of Detective Hernandez was so contradictory and so full of vague inability to remember that I cannot find that he had probable cause to arrest the defendant.

(*See id.* at 66.) As a result, the court suppressed the physical evidence recovered from Petitioner. (*See id.*)

The court declined, however, to suppress Petitioner's statement, ruling that the statement need not be suppressed because it was made spontaneously as Hernandez approached Petitioner, and the officer had enough information for "reasonable suspicion" to approach Petitioner. (*See id.* at 65–66.)

## II. *The Trial*

Petitioner's trial commenced on October 22, 1997. The People's case at trial described the "buy and bust" operation that took place on November 2, 1996. Detective Denys Trigueno ("Trigueno"), who was undercover Officer 5543, and Officer Naje Williams ("Williams"), who was undercover Officer 4359, were designated undercover officers for the operation-with Trigueno acting as the buyer and Williams as the ghost officer. (*See* Trial Transcript, Oct. 23, 1997 ("Trial Tr."), at 41–42, 88–89.)

Hernandez was designated an arresting officer. (*See id.* at 93, 112.)

Trigueno testified that, at about 11:05 A.M. that morning, he arrived at the corner of 90th Street and Amsterdam Avenue, where he saw a man standing alone. (*See id.* at 45–46.) Trigueno was in possession of approximately $55 in pre-recorded buy money. (*See id.* at 44.) Williams, as the ghost, followed Trigueno on the opposite side of the street. (*See id.* at 101–02.) Trigueno made eye contact with the man, who was standing at the curb next to a parked car. (*See id.* at 46.) Trigueno approached the man and asked him if he had "nicks," or $5 bags of cocaine. (*See id.*) The man responded, "No, I have dimes," a reference to $10 bags of cocaine. (*See id.*) Trigueno asked for "one," and handed the man $10 in pre-recorded buy money, consisting of a five dollar bill and five singles. (*See id.* at 46, 66.) Trigueno, in turn, was given a tinfoil packet. (*See id.*) The transaction took less than a minute. (*See id.* at 74.) Trigueno then left the location, but as he was leaving, he saw the seller walk into a bar near the corner of Amsterdam Avenue and 90th Street. (*See id.* at 75.) When Trigueno was almost a block away, Trigueno radioed to the arrest team that he had made a "positive buy," and provided the location of the sale and a description of the seller. (*See id.* at 49.)[1]

In court, Trigueno described the seller as approximately thirty-five years old, six feet tall, about 185 pounds, wearing a green three-quarter length coat, blue jeans, and a black baseball cap. (*See id.* at 47, 70–71.) When asked if he saw the seller in the courtroom, Trigueno identified Petitioner. (*See id.* at 46–47.) Defense

---

**1.** When Hernandez testified at the suppression hearing that he was given a description of the buyer and seller, it appears that he was referring to a separate drug transaction where another individual purchased drugs, presumably, from the same seller from whom Trigueno purchased drugs.

counsel did not object to Trigueno's in-court identification of Petitioner.

Williams testified that she observed Trigueno and the seller from across Amsterdam Avenue, which is about four to five carlengths wide. (*See id.* at 91.) Because of passing cars and buses, she was not able to clearly observe what transpired between Trigueno and the man he was talking to. (*See id.* at 90–91, 101–02.) Williams could only see well enough to observe the basic features of the man-she could see a green jacket and thought he might have been wearing a baseball cap. (*See id.* at 92.) She was not able to see his face. (*See id.* at 103.) Her primary role in the "buy and bust" operation was for the safety of Trigueno, and she did not keep any notes or write up any reports of her observations from that day. (*See id.* at 91, 98–99.) She estimated the encounter between the seller and Trigueno took less than a minute, although again, she had nothing to refresh her recollection and admitted to participating in one hundred similar operations since that day. (*See id.* at 104–05.)

Williams, who had continued to watch the seller from across the street after Trigueno walked away, saw the seller enter a bar on the same block. (*See id.* at 92.) Williams did not enter the bar, so she had no idea how many customers were in the bar at the time. (*See id.* at 106.) Williams watched the bar for as long as twenty-five minutes, and then started to follow a man that left the bar. (*See id.* at 107.) She kept a little more than a half-block behind him, and radioed his description to the arrest team, informing them that he was walking west on 90th Street. (*See id.* at 94–95.) When Williams arrived at the corner of West 90th Street and West End Avenue, she lost sight of the man. (*See id.*

at 95–96.) Williams testified that approximately a minute later, she learned that an arrest had been made at 93rd Street and West End Avenue. (*See id.* at 96, 108.)

Hernandez testified at trial that he received a transmission giving a limited description of the seller as a male in a green coat and blue jeans. (*See id.* at 126). Consistent with his testimony at the suppression hearing, Hernandez said he did not recall being given the seller's height, weight, or skin color. (*See id.*) Approximately fifteen minutes after receiving the transmissions from Trigueno and Williams, Hernandez drove to 93rd Street and West End Avenue and saw Petitioner. (*See id.* at 116–17.) [2] Hernandez, who was in plain clothes but was wearing his police badge around his neck, stopped his car one car length in front of Petitioner, approached Petitioner, and said "freeze." (*Id.* at 118.) Another member of the arrest team approached Petitioner from the opposite direction. (*See id.* at 133.) As Hernandez "reach[ed] out" for Petitioner, Petitioner threw himself to the ground and began screaming, "I can't go back, I can't go back". (*Id.* at 119.) Hernandez handcuffed Petitioner, lifted him up with the help of the sergeant from the arrest team, and placed Petitioner on the hood of a nearby car; then Hernandez searched Petitioner, and took him to the corner of 93rd Street and West End Avenue, approximately seventy-five yards from where the arrest was made. (*See id.* at 118–24, 132–35.) Hernandez did not find any pre-recorded buy money on Petitioner. (*See id.* at 135.)

After receiving a transmission that the field team had stopped someone, Williams walked to West End Avenue and 93rd Street, where she saw and recognized Peti-

2. Since Williams radioed her sighting of the man she believed to · be the seller approximately twenty-five minutes after he entered

the bar, Hernandez could not have driven to 93rd Street just fifteen minutes after Trigueno called in the identity of the seller.

tioner, who was in the custody of Detective Hernandez. (*See id.* at 97.) She confirmed that Petitioner was the man she had seen coming out of the bar and had followed. (*See id.*) She testified that the identification took place one minute after she had lost sight of him on the street. (*See id.* at 96.) Trigueno drove to the same location and, from fifteen to twenty feet away, identified Petitioner as the seller. (*See id.* at 51–52.)

At trial, Williams also made an in-court identification of Petitioner as the man she saw going into the bar. (*See id.* at 93.) Again, defense counsel did not object to Williams's in-court identification.

Petitioner presented no evidence at trial, nor did he testify. In his summation, defense counsel argued that Hernandez had arrested the wrong person based on the undercover officers' sketchy descriptions of a man in a common green fatigue jacket. He argued that the confirmatory identifications were made based on the same vague information. Defense counsel pointed out discrepancies in the officers' testimony regarding how much time elapsed between the sale and Petitioner's arrest, and the geographic distance between the sale and the arrest. In addition, defense counsel emphasized that the police lost sight of the man in the green jacket they were following, and did not find any pre-recorded buy money on Petitioner when he was arrested. (*See id.* at 152–57.)

The prosecutor's summation reviewed the testimony of the three officers, and focused on the confirmatory identifications made at the time of Petitioner's arrest. The prosecutor down-played Williams's and Hernandez's identifications, and highlighted Trigueno's confirmatory identification of Petitioner, telling the jury, "Now, [defense counsel] talked a bit about the arresting officer's description and the ghost's description. But, that's not what is important here. What's important here is

what Detective Trigueno told you." (*See id.* at 166.) The prosecutor reminded the jury of Trigueno's testimony about his confirmatory identification of Petitioner, where Trigueno stated that he "had no doubt that the defendant was the person who sold him drugs fifteen minutes earlier." (*See id.* at 165.) The prosecutor emphasized the conditions under which Trigueno observed Petitioner, and the relatively short length of time between the buy and Trigueno's confirmatory identification of Petitioner. (*See id.* at 165–73.) The prosecutor made no mention of the in-court identifications.

The trial court instructed the jury on identification in terms of one eyewitness, concluding that "the ghost" was not an eyewitness to the transaction. (*See id.* at 173.) It gave an expanded charge on identification, focusing solely on Trigueno's confirmatory identification. (*See id.* at 186–190.) The jury was told to take into consideration all the facts and circumstances that existed at the time "the witness observed the perpetrator." The court instructed the jury,

> The evidence is that the crime charged was committed on November 2nd, [sic] 1996. This trial is being held eleven months later. It is therefore relevant that shortly after the commission of the crime, while the witness' [sic] memory was fresher than at present, Detective Trigueno identified the defendant as the perpetrator of the crime.
>
> You may take into consideration the circumstances surrounding this drive-by, on-the-street identification. The certainty or lack of certainty expressed by Detective Trigueno . . .

(*Id.* at 189.) The court further cautioned the jury that it should scrutinize Trigueno's pre-trial identification with care. (*See id.*) The court reminded the jury that defendant contended that Trigueno was

mistaken when he made the pre-trial identification, and that because of such a mistake, Trigueno "is now [identifying] here in court not the person, who, in fact, committed the crime, but the person he saw on 93rd Street and West End Avenue." (*Id.*)

During jury deliberations, the jury's only request was for a read back of "any testimony regarding the identification by the buying officer, Trigueno, of the defendant at the time of the arrest. Most specifically, the distance and circumstances of the position of defendant and Trigueno." (*See id.* at 206.)

The jury found Petitioner guilty of Criminal Sale of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.39(1). On November 14, 1997, Petitioner was sentenced, as a second felony offender, to an indeterminate term of imprisonment of five and one-half to eleven years. On that same day, Petitioner was also convicted, by a guilty plea, of Criminal Possession of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.16(1), for which Petitioner was sentenced to a prison term of four and one-half years to nine years to run concurrently with the first sentence.[3]

### III. Post–Trial Proceedings

On November 10, 1999, Petitioner's appellate counsel filed a motion to vacate the judgment of conviction, pursuant to New York Criminal Procedure Law § 440.10. Petitioner's motion claimed that he was denied effective assistance of counsel when, after the suppression court ruled that Petitioner had been arrested without probable cause, defense counsel failed to move to suppress the subsequent confirmatory identifications. On May 5, 2000, Petitioner's motion was denied on procedural grounds, since a direct appeal was pending and "sufficient facts appeared on the record ... to permit adequate review thereof upon such an appeal." *People v. Massillon*, Nos. 9866/96 and 6803/97, slip op. at 1 (N.Y. Sup.Ct. May 5, 2000). Nevertheless, the court also determined that Petitioner had not been denied effective assistance of counsel, finding that, "in light of the strong eyewitness identification evidence, there was no reason to believe that the outcome of the trial would have been different if the confirmatory identifications had been suppressed." (*Id.* at 3.) On May 5, 2000, Petitioner sought leave to appeal the denial of the C.P.L. § 440.10 motion to the Appellate Division, First Department. Petitioner's leave application was granted on June 29, 2000, and consolidated with his direct appeal.

In his direct appeal to the Appellate Division, First Department, Petitioner argued that he had been denied effective assistance of counsel based upon, *inter alia*, defense counsel's failure to seek the suppression of the post-arrest confirmatory identifications.[4] The Appellate Division affirmed Petitioner's conviction on December 18, 2001. *See People v. Massillon*, 289 A.D.2d 103, 734 N.Y.S.2d 162 (2001). The

---

3. Petitioner requests that this conviction also be vacated if the Petition is granted. (*See* Petitioner's Memorandum of Law ("Pet.'s Mem."), at 28 n. 12.) Petitioner claims that his guilty plea was predicated upon the court's promise to have the sentence run concurrently with the sentence imposed for his trial conviction. (*See id.*) The Petition provides no information about the specifics of the indictment under which Petitioner pled guilty, nor has the plea allocution or the plea agreement been provided to the Court. Moreover,

Petitioner does not challenge the conviction arising out of his plea on constitutional grounds. Therefore, this Court cannot address that conviction, which must be the subject of a separate proceeding.

4. Petitioner also argued that defense counsel had failed to adequately move to suppress Petitioner's spontaneous statement to the police as the fruit of an illegal arrest. Petitioner is no longer pressing this claim in his Petition.

Appellate Division concluded that Petitioner had received effective assistance of counsel, and specifically found that Petitioner had received "meaningful representation at the suppression hearing." *Id.* at 103, 734 N.Y.S.2d at 162. It held that the "hearing record established that defense counsel would not have been able to obtain suppression of identification testimony or statements." *Id.* The court noted that defense counsel was successful in suppressing the physical evidence seized from Petitioner, since the police had conducted an unlawful search of Petitioner's person "where probable cause did not yet exist in that the confirmatory identification had not yet occurred." *Id.* at 104, 734 N.Y.S.2d at 163. However, the Appellate Division held that the hearing evidence showed that, had defense counsel also moved to suppress the confirmatory identifications, the prosecution "would have established that the police possessed, at the very least, reasonable suspicion upon which to detain Petitioner pending the confirmatory viewing." *Id.* The court pointed out that Petitioner fit the description of the seller that was "sufficiently specific, given the temporal and geographic factors, to establish reasonable suspicion." *Id.* As a result, the Appellate Division held that the confirmatory identifications were "lawfully obtained and independent of any illegality in the search." *Id.*

By letters dated January 2, 2002 and January 28, 2002, Petitioner sought leave to appeal to the New York Court of Appeals. On February 19, 2002, the Court of Appeals denied Petitioner's leave application. *People v. Massillon,* 97 N.Y.2d 731, 740 N.Y.S.2d 704, 767 N.E.2d 161 (2002).

Petitioner, represented by counsel, subsequently filed the instant Petition.

## DISCUSSION

Petitioner claims that he was denied effective assistance of counsel when, after the suppression court held that Petitioner had been arrested without probable cause, defense counsel failed to move to suppress the post-arrest confirmatory identifications as the fruits of the illegal arrest. Respondents argue that Petitioner's representation was effective and that the claim is otherwise without merit.

### I. *AEDPA Standard of Review*

Under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), "[w]hen, as here, the state court has rejected the petitioner's claim on the merits, a federal court considering a habeas corpus petition ... must defer to the state court's rejection of the claim, and must deny the writ unless ... the state court's adjudication (1) 'was contrary to' or (2) 'involved an unreasonable application of' clearly established federal law 'as determined by the United States Supreme Court.' " *See Henry v. Poole,* 409 F.3d 48, 67 (2d Cir.2005) (citing 28 U.S.C. § 2254(d)(1)).

A state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or if "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *see also Leslie v. Artuz,* 230 F.3d 25, 32 (2d Cir. 2000); *Clark v. Stinson,* 214 F.3d 315, 320 (2d Cir.2000). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision. *Williams,* 529 U.S. at 413, 120 S.Ct. at 1523; *see also Leslie,* 230 F.3d at 32.

■ The unreasonable application standard is separate from the "contrary to" standard. *See Henry,* 409 F.3d at 68. An unreasonable application of federal law means more than a simple error or an incorrect application of federal law. *See Henry,* 409 F.3d at 68 (citing *Williams,* 529 U.S. at 411, 120 S.Ct. at 1497). A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. *Williams,* 529 U.S. at 413, 120 S.Ct. at 1523. The Second Circuit has noted that *"Williams* also made clear that a federal habeas court may permissibly conclude that federal law has been unreasonably applied by the state court even though not all reasonable jurists would agree that the state court's application was unreasonable." *See Henry,* 409 F.3d at 68. Thus, a court should inquire as to whether the state court's application was objectively unreasonable-falling somewhere between merely erroneous and unreasonable to all jurists. *See Henry,* 409 F.3d at 68.

II. *Strickland Test for Ineffective Assistance of Counsel*

For the purpose of AEDPA, ineffective assistance of counsel claims are "squarely governed by the Supreme Court's holding in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Williams,* 529 U.S. at 390, 120 S.Ct. at 1511; *accord Eze v. Senkowski,* 321 F.3d 110, 124 (2d Cir.2003). A petitioner must satisfy a two-part test in order to establish that his Sixth Amendment right to effective assistance of counsel has been violated. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064–65; *Henry,* 409 F.3d at 62–63; *LanFranco v. Murray,* 313 F.3d 112, 118 (2d Cir.2002). A petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that the deficient performance of

counsel prejudiced the defense. *See Henry,* 409 F.3d at 63 (quoting *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2052).

In applying the first prong of the *Strickland* test, quality of representation, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation and internal quotation marks omitted); *see also United States v. Best,* 219 F.3d 192, 201 (2d Cir.2001) ("Actions or omissions [by counsel] that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotation marks and citations omitted). A strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." *Cox v. Donnelly,* 387 F.3d 193, 198 (2d Cir.2004); *accord Pavel v. Hollins,* 261 F.3d 210, 218 (2d Cir.2001). A court must "make every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's prospective at the time." *Henry,* 409 F.3d at 63 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2052); *see also United States v. DiTommaso,* 817 F.2d 201, 215 (2d Cir.1987); *Cox,* 387 F.3d at 198. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 6, 157 L.Ed.2d 1 (2003) (per curiam).

■ Under the prejudice prong of the *Strickland* test, a habeas petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strick-*

*land,* 466 U.S. at 694, 104 S.Ct. at 2068. "'Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.'" *Owens v. Taylor,* No. 04 Civ. 4909(PKC), 2005 WL 1705071, at *6 (S.D.N.Y. July 19, 2005) (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 375, 106 S.Ct. 2574, 2583, 91 L.Ed.2d 305 (1986)). However, to satisfy the reasonable probability test, "a defendant *need not show* that counsel's deficient conduct *more likely than not* altered the outcome of the case." *Henry,* 409 F.3d at 63 (emphasis in original) (citing *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2052). "The level of prejudice that [a petitioner] need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case." *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir.2001) (internal quotation marks omitted). "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome" of the trial. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Thus, "'the benchmark for judging any claim of ineffective assistance must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on to have produced a just result.'" *Henry,* 409 F.3d at 63 (citing *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2052). "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *even if the errors of counsel cannot be shown by a preponderance* of the evidence

to have determined the outcome.'" *Henry,* 409 F.3d at 64 (emphasis in original) (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2052); *see also Owens,* 2005 WL 1705071, at *7 (same). If a verdict or conclusion was only weakly supported by the record, it is more likely to have been affected by counsel's errors; whereas, when there is overwhelming evidence of guilt, even serious errors will not warrant granting a writ of habeas corpus. *See Gersten v. Senkowski,* 426 F.3d 588, 611 (2d Cir.2005). Applying these standards to Petitioner's claim, the Court finds that both prongs have been satisfied.

### A. *Defense Counsel's Performance*

In the instant case, to satisfy the first prong of *Strickland,* Petitioner must show that defense counsel's failure to move to suppress the confirmatory identifications was "unreasonable under prevailing professional norms and ... was not sound strategy." *Kimmelman,* 477 U.S. at 381, 106 S.Ct. at 2586.

■ Petitioner claims that defense counsel's failure to move for suppression of the confirmatory identifications at the suppression hearing was unreasonable because the suppression court had already held that Petitioner's arrest had been effectuated without probable cause, and as a result, the court suppressed the evidence seized from Petitioner. (*See* Pet.'s Mem. at 19.)

After the court suppressed the evidence found on Petitioner, which did not even include any of the "buy" money used in the operation, there was no other physical evidence linking Petitioner to the alleged buy. Rather, the identification of Petitioner as the seller was the primary evidence in the case.[5] Nevertheless, defense counsel did not move during the suppression hearing,

---

5. Petitioner's spontaneous statement, "I can't go back. I can't go back.", is at best weak

consciousness of guilt evidence.

or even later at trial, to suppress the confirmatory identifications as the fruits of the illegal arrest.

It is clear that counsel's failure to move to suppress the confirmatory identifications stemmed from a misunderstanding of the legal principles surrounding the suppression of pre-trial identifications, rather than trial strategy. "Courts have routinely declared assistance ineffective when 'the record reveals that counsel failed to make a crucial objection or to present a strong defense solely because counsel was unfamiliar with clearly settled legal principles.'" *Thomas v. Varner,* 428 F.3d 491, 501 (3d Cir.2005) (quoting Wayne LaFave et al., Criminal Procedure § 11.10(c), at 721 (2d ed.1999)); *see also Greiner v. Wells,* 417 F.3d 305, 325 (2d Cir.2005) ("Evidence of defense counsel's decision-making process sometimes demonstrates constitutional deficiency Indeed, courts have found deficient performance where counsel's conduct resulted from . . . a legal error or misunderstanding of the law, [or] a misunderstanding of the case . . . .") (citations omitted). In preparation for Petitioner's § 440.10 motion, Petitioner's appellate counsel questioned defense counsel about his failure to move to suppress the confirmatory identifications. Defense counsel explained, "If I didn't ask for suppression [of them], I didn't think there was anything to suppress Confirmatory i.d.'s are not usually the subject of a suppression hearing." (*See* Pet.'s Mem. at 15 & Appendix A–10.) [6]

To the contrary, if defense counsel had moved to suppress the confirmatory identifications, the motion would have had a strong likelihood of success. The test of whether evidence should be excluded following an illegal arrest is whether the evidence was obtained by "exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Pretrial identifications may be suppressed as the fruit of an illegal arrest, even if not otherwise unduly suggestive. *See United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); *accord Owens,* 2005 WL 1705071, at *6. The Second Circuit has held that, "[when] flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring any use of them can adequately serve the deterrent purpose of the exclusionary rule." *Id.* The prosecution bears the burden of demonstrating admissibility, and the court must focus on the causal connection between the illegality and the evidence. *Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); *accord Owens,* 2005 WL 1705071, at *6.

In this case, the suppression court determined that there was no probable cause to arrest Petitioner, because the arrest took place before the confirmatory identifi-

---

**6.** Respondents contend that these statements by defense counsel are hearsay, and were never attested to pursuant to an affidavit or declaration. The Court notes that it does not need to rely on this explanation by defense counsel to find defense counsel's failure to move to suppress the confirmatory identifications deficient representation. There could have been no strategic reason for defense counsel's failure to attempt to suppress the confirmatory identifications, which were the

strongest evidence against Petitioner. *See Saltys v. Adams,* 465 F.2d 1023, 1029 (2d Cir.1972) (explaining as part of its grant of habeas corpus based on ineffective assistance of counsel that "we cannot see what conceivable trial strategy was followed in, or what tactical advantage could be obtained from [ ] failing to object to . . . admission of identification testimony" that was the only evidence against defendant connecting him to the alleged crime).

cations. (*See* Suppression Tr. at 66.) Hernandez also admitted to arresting Petitioner when he detained him on 93rd Street, and the prosecutor conceded at the suppression hearing that Petitioner had been arrested before the identifications took place. (*See id.* at 39, 56.)

This Court need not revisit the determination that Petitioner was illegally arrested, as opposed to validly stopped based on reasonable suspicion, because counsel's performance must be evaluated in the context of the suppression court's decision. Yet, there is ample support for the conclusion that the arresting officers' actions toward Petitioner constituted an arrest.

 Petitioner was, at the very least seized, for Fourth Amendment purposes, as any reasonable person would have felt they were not free to leave under the circumstances. *See Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *see also United States v. Moreno*, 897 F.2d 26, 30 (2d Cir.1990) (holding that the test for determining whether an encounter with police constitutes a seizure is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."). Furthermore, " '[t]here are … occasions when law enforcement officers [ ] exceed the bounds of permissible safeguards and thereby convert an otherwise legitimate investigative stop into a de facto arrest requiring probable cause.' " *United States v. Campbell*, 959 F.Supp. 606, 612 (W.D.N.Y.1997) (quoting *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990)). "A high level of detention constituting an arrest occurs 'if the totality of the circumstances indicates that an encounter became too intrusive to be classi-

fied as an investigative detention …' " *Dejesus v. Village of Pelham Manor*, 282 F.Supp.2d 162, 168 (S.D.N.Y.2003) (quoting *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir.1991)).

 The seizure of Petitioner in this case was not undertaken in a manner that would suggest that it was merely investigatory in nature. Petitioner was approached from both sides by at least two members of the arrest team, who shouted "police" and ordered Petitioner to "freeze." (*See* Trial Tr. at 118, 133; Suppression Tr. at 25.) Hernandez reached out for Petitioner, and when Petitioner fell to the ground in response, Hernandez handcuffed him. (*See* Suppression Tr. at 25.) Hernandez testified at the suppression hearing that he grabbed and detained Petitioner without asking Petitioner any questions. (*See* Suppression Tr. at 39.) *See United States v. Zabala*, 52 F.Supp.2d 377, 382 (S.D.N.Y.1999) (concluding that detention was not an investigatory confrontation where defendants were confronted by officers with guns drawn, removed from car, required to lay down on the ground and handcuffed). There is no indication that the physical force used on Petitioner was warranted based on his actions. Hernandez admitted that he observed nothing that gave him an indication that Petitioner might have been armed (*see* Suppression Tr. at 40–41), and Hernandez made no attempt to frisk Petitioner before handcuffing him. In fact, Petitioner was fully searched rather than frisked for weapons. Although Petitioner allegedly fell to the ground when approached by the arrest team, he did not attempt to flee. Hernandez's testimony gives no indication that Petitioner's actions created a need for the use of force beyond that generally employed in a limited detention.[7] Nor did

---

**7.** As the Second Circuit has noted, although narcotics traffickers are often armed and violent, that generalization, without more, is insufficient to justify extensive intrusion. *See United States v. Ceballos*, 654 F.2d 177, 184 (2d Cir.1981). "If it were, any narcotics sus-

the arrest team attempt to explain to Petitioner the purpose of their "stop," or make any other efforts to calm him down before handcuffing him, searching him, and physically removing him down the block for the confirmatory identification.

Thus, the Court concludes that Petitioner's detention amounted to a *de facto* arrest—a reasonable person would not have believed he was free to leave, and the measures used by the arrest team were clearly more forceful and intrusive than necessary to permit the undercover officers an opportunity to make a confirmatory identification. *Cf. United States v. Marin,* 669 F.2d 73, 81 (2d Cir.1982) (holding that stop of car by DEA agents amounted to arrest where agents boxed in defendant's car impeding its progress, agents surrounded car with guns drawn, at least two occupants were pulled from car by agents, and defendant was physically restrained by agents when he tried to walk away); *Ceballos,* 654 F.2d at 184 (holding that seizure constituted arrest from the moment the progress of defendant's car was blocked and he was faced by officers with guns drawn and ordered out of his car); *Zabala,* 52 F.Supp.2d at 382 (concluding that police conduct constituted arrest where several officers had assembled to stop and search defendants, and officers approached defendants with guns drawn, pulled defendants from their car, required them to lay down, and handcuffed defendants); *Campbell,* 959 F.Supp. at 612 (holding that officers' actions amounted to de facto arrest where defendant's vehicle was blocked in, officers approached with guns drawn, and defendant was physically pulled from car and handcuffed).

The suppression court also found Petitioner's arrest illegal, because it was unsupported by probable cause. Because the issue here is what is likely to have oc-curred had defense counsel moved to suppress the confirmatory identifications, there is no real need to independently assess whether Petitioner was illegally arrested. As noted, since the suppression court made the determination that Petitioner was arrested, counsel's performance must be evaluated in light of the suppression court's determination.

■ In any event, the suppression court's conclusion that the police lacked probable cause to arrest Petitioner was legally sound. "Although the existence of probable cause must be determined with reference to the facts of each case, in general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person being arrested." *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983). An arrest is not made based on probable cause where "the information possessed by officers could have applied to any number of persons and did not reasonably single out from that group the person arrested." *Id.* (citing *Wong Sun,* 371 U.S. at 479, 83 S.Ct. at 412). In this case, the arrest team acted on a vague and commonplace description of a man in a green jacket and jeans; the undercover officers had failed to describe any facial or physical characteristics of the seller. *See United States v. Viscioso,* 711 F.Supp. 740, 749 (S.D.N.Y.1989) (finding identifications reliable because police used a variety of procedures to identify suspects accurately and did not rely on a single description in making arrests, but noting that "[h]ad the undercover merely given a very general description ... and had another officer

pect, even if unknown to the agents and giving no indication that force is necessary, could be faced with 'maximal intrusion' based on mere reasonable suspicion." *Id.*

made the arrest based on this information alone, the Court would most likely have concluded that the arrests were made without probable cause."). Petitioner was also arrested several blocks away from, and possibly more than half an hour after, the "buy." Although the seller was last seen on 90th Street and Amsterdam Avenue heading west, Petitioner was arrested on 93rd Street. Hernandez also gave contradictory testimony as to the geographic details and timing of the arrest in relation to the information provided by the undercover officers. Thus, although there might be a question as to whether the arresting officers had reasonable suspicion to detain Petitioner, they clearly lacked probable cause for his arrest. *See United States v. Rosario*, 543 F.2d 6, 8 (2d Cir.1976) (holding that physical description of suspect as unknown male "m/w/28 yrs., 5′8 tall, 155 lbs, light complexion, wearing blue trousers, multi[-]colored shirt and sneakers" was not specific enough to support arrest because the description would fit "a very large group of ordinary young men."); *People v. Garcia*, 232 A.D.2d 272, 272, 648 N.Y.S.2d 555, 556 (1st Dep't 1996) (holding that police did not have probable cause to arrest defendant based solely on radioed description, where the only testimony by the arresting officer was that defendant matched the radioed description of the suspect); *compare United States v. Valez*, 796 F.2d 24, 27 (2d Cir.1986) (finding description of seller sufficiently detailed to provide probable cause where defendant matched every detail of undercover officer's description of a "Hispanic male in his twenties, wearing a black leather jacket, grey pants with a comb in the back pocket, and a white or off-white V-neck shirt with dark trim on the collar," and defendant was within the immediate vicinity of the drug sale not more than ten minutes after the undercover officer gave the description.)

The causal link between Petitioner's illegal arrest and the pre-trial identifications is obvious and unattenuated. After Hernandez arrested, searched, and handcuffed Petitioner, he walked Petitioner seventy-five yards to the street corner where the confirmatory identifications occurred. The operation team made the tactical decision that day that the undercover officers would not make any arrests immediately following the buy. Rather, the undercover officers made the buy, allowed the seller to leave, and radioed a description to the arrest team, who then attempted to follow the seller. However, both undercover officers lost sight of the seller after the buy; this occurred at least three blocks away from where Petitioner was arrested. If Hernandez had not illegally arrested Petitioner, the confirmatory identifications relating to this specific "buy and bust" operation would not have been possible. The arrest appears to have been made for no other purpose than to secure the confirmatory identifications. As a result, there is a strong probability that the confirmatory identifications would have been suppressed. *Cf. People v. Gethers*, 86 N.Y.2d 159, 630 N.Y.S.2d 281, 654 N.E.2d 102 (1995) (holding, under circumstances similar to those in this case, that a confirmatory identification made after an illegal arrest must be suppressed even when the identification is not otherwise unduly suggestive, and ordering that a new trial be held after an independent source hearing); *People v. Brown*, 256 A.D.2d 414, 416, 682 N.Y.S.2d 229, 229 (2d Dep't 1998) (holding that victims' lineup identifications of defendant should have been suppressed as the fruits of an illegal arrest, where the defendant was arrested without probable cause based only on information supplied by an anonymous caller and a scant observation from one of the victims); *Garcia*, 232 A.D.2d at 272, 648 N.Y.S.2d at 556 (holding that money recovered from defendant af-

ter his arrest and undercover officer's drive-by show-up identification must be suppressed as fruits of illegal arrest because defendant was arrested without probable cause, where the prosecution offered no testimony at suppression hearing other than that defendant matched a radioed suspect description); *People v. Beruvais*, 231 A.D.2d 733, 734, 648 N.Y.S.2d 117, 119 (2d Dep't 1996) (holding that victim's lineup identification should be suppressed as the fruit of an illegal arrest, where defendant was arrested without probable cause based on the unverified call from a confidential informant); *People v. Hollins*, 147 A.D.2d 918, 918, 537 N.Y.S.2d 368, 369 (4th Dep't 1989) (suppressing show-up identification where defendant was handcuffed and transported back to the crime scene for show-up identification without probable cause).

If the confirmatory identifications had been suppressed, there is a reasonable likelihood that the outcome of Petitioner's trial would have been different. As discussed in more detail below, with the pretrial identifications suppressed, the prosecution's case would have contained little evidence of any real probative value. The in-court identifications given by the undercover officers were at best based on year-old memories of a less than one-minute "buy," and at worst, were solely a product of the suggestive courtroom setting; Trigueno's description of the seller was unsupported by any evidence of Petitioner's actual physical characteristics, and Petitioner's spontaneous statement when he was stopped was only weak evidence of guilt.

Given that the confirmatory identifications were made possible by the illegal arrest of Petitioner, and that a motion to suppress the confirmatory identifications would have had a high probability of success, this Court concludes that, in failing to seek suppression of the confirmatory iden-

tifications, defense counsel's representation fell below the range of reasonable professional assistance. The failure clearly had no sound strategic basis. Moreover, by failing to challenge the pre-trial identifications, defense counsel lost the opportunity to challenge the officers' in-court identifications. If the pretrial identifications had been suppressed, the in-court identifications would have been admissible only if they were independently reliable. *See People v. Riley*, 70 N.Y.2d 523, 532, 522 N.Y.S.2d 842, 847, 517 N.E.2d 520 (1987); *United States v. Salameh*, 152 F.3d 88, 126 (2d Cir.1998). Therefore, this Court concludes that Petitioner has met the first prong of the *Strickland* test. *Cf. Thomas*, 428 F.3d at 501 (holding that counsel's failure to move to suppress an in-court identification by a central witness, when there were compelling grounds to move to suppress, was not objectively reasonable representation); *Saltys*, 465 F.2d at 1028–29 (granting habeas corpus based on counsel's " 'woefully inadequate' " failure to seek suppression of, or object to, identification testimony that was the only evidence against defendant) (citation omitted); *Owens*, 2005 WL 1705071, at *6 (finding first prong of *Strickland* met based on counsel's failure to seek suppression of precinct identification, where trial court found at suppression hearing that there was no probable cause for arrest, and it suppressed items seized in post-arrest search of the petitioner).

### B. *Prejudice*

Having established that defense counsel's performance was professionally unreasonable, Petitioner must demonstrate prejudice resulting from this deficiency. Here, Petitioner is required to show that his attorney's failure to move for suppression of the confirmatory identifications prejudiced his defense such that there is a

reasonable probability that the result of his trial would have been different.

In view of the fact that when arrested, Petitioner was not found with the buy money, and the drugs Petitioner was found with were suppressed, had counsel challenged and succeeded in suppressing the confirmatory identifications, it is likely that Petitioner would never have been prosecuted. Nevertheless, there was a prosecution and a trial, and the Court must assess the impact on the trial of the confirmatory identifications. Assuming a motion to suppress the confirmatory identifications had been granted, the undercover officers' in-court identifications would have still been admissible at trial if the identifications had an independent basis. *See Riley*, 70 N.Y.2d at 532, 522 N.Y.S.2d at 847, 517 N.E.2d 520; *People v. Smart*, 305 A.D.2d 1110, 1110, 760 N.Y.S.2d 606, 607 (4th Dep't 2003); *People v. Garcia*, 255 A.D.2d 522, 522–23, 682 N.Y.S.2d 54, 55 (2d Dep't 1998); *People v. Williams*, 222 A.D.2d 149, 152, 646 N.Y.S.2d 665, 667 (1st Dep't 1996); *see also Manson v. Brath-*

*waite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *United States v. Wade*, 388 U.S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149 (1967); *Salameh*, 152 F.3d at 126; *Mena v. Smith*, No. 03 Civ. 3295(GEL), 2004 WL 2071668, at *2 (S.D.N.Y. Sept.16, 2004).

If the in-court identifications lacked an independent source and were suppressible, then Petitioner can clearly show prejudice. That is, once the in-court identifications are removed from the case, the remaining evidence against Petitioner would have consisted of Trigueno's in-court description of the seller, which was unsupported by corroborating evidence matching the description to Petitioner's actual physical characteristics, and which could have applied to countless individuals, and Petitioner's spontaneous statement, "I can't go back. I can't go back." Therefore, it is necessary to determine whether the officers' in-court identifications would have been admissible despite the flawed pretrial confirmatory identifications.[8]

8. Once the confirmatory identifications were suppressed, Petitioner could have also challenged the in-court identifications as fruits of his illegal arrest, under *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). *See People v. Rogers*, 52 N.Y.2d 527, 533, 439 N.Y.S.2d 96, 98, 421 N.E.2d 491 (1981) (employing *Crews* to evaluate defendant's statements' attenuation from an illegal arrest). "In *U.S. v. Crews*, the Supreme Court held that the Fourth Amendment would not require the exclusion of an in-court identification if (1) the witness is present at trial to testify as to what transpired between him and the offender; (2) the witness 'possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from [his] observations of him at the time of the crime'; and (3) 'the defendant is also physically present in the courtroom, so that the [witness] can observe him and compare his appearance to that of the offender.' " *Owens*, 2005 WL 1705071, at *8 (quoting *Crews*, 445 U.S. at 471, 100 S.Ct. at 1250). "If 'none of these three elements has

been come at by the exploitation of the violation of the defendant's Fourth Amendment rights,' the identification is admissible." *Id.* Under the second prong of *Crews*, Petitioner could have argued that the officers did not have the ability to identify Petitioner from their observations of the seller preceding Petitioner's unlawful arrest. Moreover, under the third prong of *Crews*, Petitioner would appear to have a very strong argument that his presence in the courtroom was solely a result of his illegal arrest. Unlike in *Crews* and *Owens*, there is no indication here that the police knew Petitioner's identity, or that the arrest team had already focused on Petitioner and suspected him of involvement in the crimes for which he was charged. *See Owens*, 2005 WL 1705071, at *9 n. 2. Rather, defense counsel could have argued quite forcefully that Petitioner's arrest in violation of the Fourth Amendment yielded Petitioner's identity as well as most of the evidence introduced at Petitioner's trial connecting him to the drug sale.

1. *Feasibility of Conducting an Independent Source Hearing*

Petitioner argues that the in-court identifications were not reliable because the undercover officers had a limited length of time to view the seller during the operation, and because the in-court identifications occurred in a highly suggestive courtroom setting almost a year after the "buy and bust" operation. (*See* Pet.'s Mem. at 24.)

▆ Because defense counsel did not move to suppress the confirmatory identifications, defense counsel did not subsequently challenge the undercover officers' in-court identifications or move for an independent source hearing on the in-court identifications. If an independent source hearing had been held, the state would have had the burden of establishing the admissibility of the in-court identifications by clear and convincing evidence. *See New York v. Rahming*, 26 N.Y.2d 411, 416–17, 311 N.Y.S.2d 292, 259 N.E.2d 727 (1970); *People v. Ortiz*, 7 A.D.3d 544, 544, 775 N.Y.S.2d 579, 579–80 (2nd Dep't 2004); *People v. Frost*, 289 A.D.2d 23, 24, 734 N.Y.S.2d 18, 19 (1st Dep't 2001). However, once the trial court failed to hold an independent source hearing, had the Appellate Division reached the issue, it would not have been permitted under New York law to make its own findings of an independent source based on the witnesses' trial testimony. *See People v. James*, 67 N.Y.2d 662, 664, 499 N.Y.S.2d 670, 490 N.E.2d 537 (1986). The New York Court of Appeals has refused to allow the appellate courts to hold an appeal in abeyance while a post-trial hearing to supply an independent source is conducted. *See People v. Burts*, 78 N.Y.2d 20, 23, 571 N.Y.S.2d 418, 420, 574 N.E.2d 1024 (1991). Rather, once the Appellate Division concludes that an independent source issue should have been resolved prior to the trial, New York law insists on a "clean break and fresh start remedy," requiring the case be remitted for a suppression hearing and new trial. *See id.* at 23–24, 571 N.Y.S.2d at 420, 574 N.E.2d 1024.

Since there was no state court determination on the independent source issue, and a post-trial independent source hearing can no longer be held in the state courts, this Court considered holding its own independent source hearing. "A district court has broad discretion to hear further evidence in habeas cases." *Nieblas v. Smith*, 204 F.3d 29 (2d Cir.1999) (citing *Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). A district court's discretion is only restricted by the limitations set forth in 28 U.S.C. § 2254(e). At the Court's request, Petitioner and Respondents filed supplemental briefs addressing the issue, including the feasibility of this Court engaging in factfinding some ten years after Petitioner's trial, as to whether there was an independent source for the in-court identifications.

Respondents suggest, and Petitioner does not disagree, that the Court should rely on the trial transcript to assess the admissibility of the in-court identifications. As Respondents contend, the trial transcript is "as accurate and complete a record as [the Court] will ever have" as to whether there was an independent source for the in-court identifications. (*See* Respondents' Supplemental Brief, dated Dec. 19, 2005, at 3.) The officers testified and were cross-examined at trial about the circumstances surrounding the "buy and bust" operation and their opportunity to observe the seller.

The Court agrees that an independent source hearing at this point could not reliably expand the factual record and would not assist the Court in its determination of whether the police officers' in-court identifications were independently reliable. It has been almost ten years since Petition-

er's trial. The officers who gave in-court identifications have worked for the Manhattan North Narcotics Division since the mid-nineties. (*See id.* at 3.) As narcotics officers, these officers effect a high volume of arrests and have testified at hundreds of trials over the last decade. (*See id.*) Petitioner's drug sale and arrest were unremarkable. It is therefore difficult to believe that, ten years after the fact, the officers could accurately recall the circumstances of Petitioner's arrest which may have informed their in-court identifications.

Accordingly, as other federal courts have done, the Court concludes that the most reliable assessment of the independent source issue can be derived from the trial testimony of the police officers. *See e.g., Cossel v. Miller,* 229 F.3d 649, 655–656 (7th Cir.2000) (looking to grand jury and trial testimony to determine whether there was an independent basis for an in-court identification, where counsel had failed to challenge pretrial and in-court identifications, and no independent source hearing was ever held); *Owens,* 2005 WL 1705071, at *9 (noting that a federal court reviewing a habeas petition may conclude that an in-court identification is independently reliable without remanding for an independent source hearing, where the record provides a basis for such a conclusion).

### 2. Admissibility of the In–Court Identifications

If the state court had held an independent source hearing, it would have evaluated whether the officers had a reliable source, independent of the unlawful post-arrest identifications, for their in-court identifications of Petitioner. *See Riley,* 70 N.Y.2d at 532, 522 N.Y.S.2d at 847, 517 N.E.2d 520; *Smart,* 305 A.D.2d at 1110, 760 N.Y.S.2d at 607; *Garcia,* 255 A.D.2d at 522–23, 682 N.Y.S.2d at 55; *Williams,* 222 A.D.2d at 152, 646 N.Y.S.2d at 667. "An in-court identification is not precluded by an unlawful procedure so long as there is clear and convincing evidence that the in-court identification derives from an independent basis which preceded the unlawful procedure." *People v. Albert "J",* 138 A.D.2d 773, 774, 525 N.Y.S.2d 393, 395 (3d Dep't 1988). In assessing independent reliability, New York Courts utilize the factors set out in *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). The *Biggers* factors include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S.Ct. at 382; *accord Smart,* 305 A.D.2d at 1110–11, 760 N.Y.S.2d at 607 (quoting *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382); *Albert "J",* 138 A.D.2d at 774, 525 N.Y.S.2d at 395 (same). The *Biggers* factors are assessed in light of the totality of the circumstances. *See Frost,* 289 A.D.2d at 24, 734 N.Y.S.2d at 18 (citing *Biggers, passim* ).

With respect to Officer Williams, at the time of the crime, Williams observed Detective Trigueno and the seller across five lanes of traffic, with cars and buses blocking her view. (*See* Trial Tr. at 91.) She was unable to see what exactly took place between the two men. (*See id.*) Her role in the operation was for the safety of Trigueno, not for the purpose of identifying the seller. (*See id.* at 92.) When asked in court to describe the physical characteristics of the seller, she testified only that she remembered a darker-skinned male, about five foot nine inches tall, wearing a green army coat. (*See id.*) Significantly, at the confirmatory identification, Williams did not even identify Petitioner as the seller. Rather, she was cer-

tain only that he was the man she had followed out of the bar. (*See id.* at 96.) When asked to make the in-court identification, Williams again shied away from identifying Petitioner as the seller—she only identified Petitioner as the person she saw going into the bar. (*See id.* at 93.) Moreover, eleven months had elapsed between the "buy and bust" operation and Williams's in-court identification of Petitioner. Williams did not keep any notes or write up any reports in her role as "ghost." (*See id.* at 98–99, 104–05.) She admitted to participating in at least one hundred similar "buy and bust" operations since Petitioner's arrest. (*See id.* at 104–05.) During cross-examination, Williams also conceded that it was hard for her to recall all the particulars of the cases in which she had acted as a ghost, this case included. (*See id.* at 100.)

In all likelihood, Williams's in-court identification had no independent basis whatsoever, and stemmed from the suggestive courtroom setting in which Petitioner was being tried as the seller. At best, the identification relied on the suppressed pre-trial identification where Williams saw Petitioner, wearing a green jacket and hand-cuffed, at the corner of 93rd Street and Amsterdam Avenue. In either case, applying the *Biggers* factors, Williams's in-court identification clearly lacks an independent basis.[9]

Trigueno's identification presents a more difficult question. The first *Biggers* factor evaluates the opportunity of the witness to view the defendant at the time of the crime. At the time of the crime, Trigueno was standing "an arm's distance away" from the seller in broad daylight, although the entire transaction took less than a minute. (*See id.* at 45–47.) Thus, the first *Biggers* factor weighs in favor of independent reliability.

The second *Biggers* factor focuses on the witness's degree of attention during the viewing. As the undercover officer in the "buy and bust" operation, Trigueno's primary role was to purchase the drugs. (*See id.* at 39–40.) He received special training as an undercover officer, which included training in identifying individuals. (*See id.* at 39.) His degree of awareness as to what was going on around him during the operation would have been high. (*See id.*) However, Trigueno interacted with the seller for less than a minute. The degree of attention he was paying to the seller's description during that one minute is belied by the cursory description of the seller Trigueno radioed to the arrest team. (*See* Trial Tr. at 16; Suppression Tr. at 14–15.) He only described the seller's ubiquitous clothing and omitted any physical characteristics or any distinguishing facial features. (*See id.*) In light of the above, the Court finds the second *Biggers* factor ambiguous, at best, and more suggestive of an absence of independent reliability.

The third *Biggers* factor, the accuracy of Trigueno's prior description of the seller, is similarly weak in this case. At trial, with Petitioner present in the courtroom, Trigueno described the seller's physical

---

**9.** Because there was no independent source hearing, there is no way of knowing whether Williams's identification was based on refreshing her memory using other evidence—such as the mug shot of Petitioner, taken the day after his arrest, that was shown to Trigueno during his direct examination and admitted into evidence, presumably for the purpose of showing that Petitioner was wearing a green jacket. (*See id.* at 52–53, 55–57.) During cross-examination, Williams did testify that she had no reports of her own from the operation with which to refresh her recollection, and had not looked at anyone else's reports in preparing for trial. (*See id.* at 100–02.) However, she was never fully cross-examined about what exactly she reviewed in preparation for Petitioner's trial, and was never cross-examined about how she was able to identify Petitioner at trial.

characteristics during the transaction as being thirty-five years old, six feet tall, about 185 pounds, and wearing a green coat, blue jeans, and a black baseball cap. (*See id.* at 47, 70–71.) However, Trigueno's trial testimony does not necessarily reflect on the accuracy of Trigueno's prior description of the seller on the day of the operation. Indeed, on the day of Petitioner's arrest, Trigueno provided no physical characteristics in his description of Petitioner. Notably, as Petitioner points out, Trigueno's description, both on the day of the operation and in court, left out Petitioner's most defining characteristics, such as the mustache and goatee Petitioner had on the day in question. (*See* Petitioner's Supplemental Reply Brief, dated Jan. 6, 2006, at 4.) Trigueno was not cross-examined about the basis of his in-court description of the seller, *e.g.,* whether he reviewed his buy report or viewed Petitioner's mug shot in formulating the description. Given his far more detailed description at trial, eleven months after the arrest, than he provided on the day of the arrest, there is every reason to believe that his trial testimony was a function of trial preparation, rather than independent recollection. As mentioned above, Hernandez testified at both the suppression hearing and at trial that he received only a limited description of the seller from the undercover officers, as a man in a green jacket and blue jeans. (*See* Trial Tr. at 16; Suppression Tr. at 14–15.) The lack of detail in Trigueno's description of the seller on the day of the operation factors in favor of Petitioner. *Cf. Cossel,* 229 F.3d at 656 (finding that the third *Biggers* factor weighed against reliability of victim's in-court identification because defendant did not fit the pre-identification description given by victim); *United States v. Dring,* 930 F.2d 687, 693 (9th Cir.1991) (noting that agents' failure to mention in their initial reports that defendant had worn a beard detracted from the reliability of their in-court identifications);

*Dickerson v. Fogg,* 692 F.2d 238, 245–46 (2d Cir.1982) (holding that victim's vague description of assailants and inability to provide a minimally detailed description when he talked to police undermined the reliability of his identification of his assailants).

The fourth *Biggers* factor considers the witness's level of certainty at the confrontation. At trial, the prosecutor asked Trigueno if he saw "the person he purchased drugs from here in the courtroom," and Trigueno identified Petitioner as the seller. (*See* Trial Tr. at 46–47.) Defense counsel did not attempt to test Trigueno's recollection, by asking for example, what he had reviewed in preparation for trial. Although Trigueno did not appear uncertain about the identification, it took place in the highly suggestive courtroom setting. It is just as likely that Trigueno's certainty was a product of Petitioner's presence in the courtroom, as it was the product of Trigueno's independent recollection of the operation. The Court does not view Trigueno's in-court identification as indicating, one way or another, the independent reliability of his identification. *See United States v. Rogers,* 387 F.3d 925, 938 (7th Cir.2004) (giving little weight to the certainty of a witness's in-court identification, because the presence of a single defendant at a criminal trial can be suggestive and noting, " 'the most certain witnesses are not invariably the most reliable ones.' ") (citation omitted); *Cossel,* 229 F.3d at 656 n. 8. (concluding that the certainty of a witness had little relevance under *Biggers,* because the witness's level of certainty was just as likely to be a product of an unduly suggestive identification as a product of the independent recollection of the crime).

The final *Biggers* factor, the passage of time between the incident and the confrontation, cuts against the reliability of Trigueno's in-court identification. As with

Williams, Trigueno's in-court identification took place approximately eleven months after the undercover operation. Trigueno had also participated in over one hundred "buy and bust" operations in the interim. (*See* Trial Tr. at 62.) Thus, passage of almost a year between the undercover operation and Petitioner's trial weighs against independent reliability. *See Biggers*, 409 U.S. at 202, 93 S.Ct. at 383 (noting that a seven-month lapse between the crime and the confrontation would be a seriously negative factor in most cases); *United States v. Wong,* 40 F.3d 1347, 1360 (2d Cir.1994) (noting that the ten-month period between the crime and a lineup militated against reliability); *United States v. Rundell,* 858 F.2d 425, 427 (8th Cir.1988) (concluding that eight months between a robbery and an in-court confrontation negatively affected reliability under *Biggers* ).

Therefore, only the first *Biggers* factor clearly weighs in favor of the independent reliability of Trigueno's in-court identification. Considering the totality of the circumstances, which includes Trigueno's brief encounter with the seller, the generality of the description given to the arrest team, and the passage of nearly eleven months since the "buy and bust" operation, the Court concludes that the independent reliability of Trigueno's in-court identification is highly doubtful. Thus, if the in-court identifications had been challenged by defense counsel, it is probable that the prosecution would not have been able to meet its burden of proving admissibility by clear and convincing evidence. If the confirmatory identifications and the in-court identifications had been suppressed, it is more than reasonably likely that the outcome of Petitioner's trial would have been different. The jury's verdict in this case was not supported by overwhelming evidence. The prosecution's case did not include any physical evidence, and no pre-recorded buy money was found on Peti-

tioner. As mentioned, the testimony of the officers was riddled with inconsistencies regarding, among other things, the level of detail radioed to the arrest team. The prosecutor did not elicit Petitioner's actual physical characteristics to allow for a comparison with the in-court description of the seller given by Trigueno, and this description would have been meaningless if unaccompanied by testimony about the confirmatory or in-court identifications. The only other evidence consisted of Petitioner's statement to Hernandez, "I can't go back. I can't go back.", which is at best weak evidence of Petitioner's guilt. Indeed, in charging the jury on Petitioner's statement, the court instructed,

> [P]roof of conduct evidencing consciousness of guilt has slight value standing alone. Such evidence may never be made a basis for a finding of guilt. It has no meaning unless there were other facts pointing to motive which prompted that conduct in this case.

(*See* Trial Tr. at 184.)

If the confirmatory and in-court identifications had been suppressed, as is likely, there is a substantial likelihood that the result of the trial would have been different, given the overall weakness of the evidence at trial. Indeed, even if a motion to suppress the in-court identifications had been denied, there is still a reasonable likelihood that the outcome of the trial would have been different. When unsupported by the confirmatory identifications, it is unlikely that the jury would have given Trigueno's in-court identification much weight, coming eleven months after the one-minute "buy" transaction, with approximately one hundred similar transactions in the interim. Williams's in-court identification had almost no probative value since she never viewed the seller clearly during the operation. In fact, at the trial, the prosecutor put very little emphasis on the in-court identifications. Rather, the

pre-trial identifications were emphasized during the examination of the officers and in the prosecutor's summation. Indeed, the prosecutor made no mention of the in-court identifications in his summation. (*See id.* at 160–73.) Moreover, the only inquiry made by the jury during its deliberations concerned Trigueno's pretrial confirmatory identification. Suppression of the confirmatory identifications would have drastically diminished the strength of the prosecution's case. As noted, the prosecution's case would have consisted of (1) two in-court identifications made by officers who had participated in over one hundred drug buys in the eleven-month period since Petitioner's arrest, one of whom never even had a clear view of the seller during the transaction, (2) an unsubstantiated description of the seller, and (3) Petitioner's ambiguous statement made to Hernandez. Given the weaknesses of the in-court identifications, and the emphasis placed on the confirmatory identifications by the prosecutor and the jury, there is a reasonable likelihood that the outcome of the trial still would have been different if only the confirmatory identifications had been suppressed.

The Court therefore concludes that counsel's failure to move to suppress the confirmatory identifications, and failure to subsequently challenge the lack of independent reliability of the in-court identifications, clearly prejudiced Petitioner. *See*

*Thomas,* 428 F.3d at 503–04 (sustaining grant of habeas petition where counsel failed to move to suppress questionable in-court identification, and finding that in-court identifications were not independently reliable under *Biggers* ); *Cossel,* 229 F.3d at 656 (reversing denial of writ of habeas corpus where counsel failed to move to suppress tainted pre-trial identification and subsequent in-court identification, and finding that in-court identification lacked sufficient independent reliability to be admissible).

### III. *Application of AEDPA to Petitioner's Claim*

■■■ The Appellate Division concluded that Petitioner received "meaningful representation at the suppression hearing," citing only the New York standard for ineffective assistance of counsel. *See Massillon,* 289 A.D.2d at 103, 734 N.Y.S.2d at 163 (citing *People v. Benevento,* 91 N.Y.2d 708, 713–14, 674 N.Y.S.2d 629, 633, 697 N.E.2d 584 (1998)). However, this does not affect this Court's analysis, as the New York standard is not contrary to the *Strickland* test. *See Eze v. Senkowski,* 321 F.3d 110, 124 (2d Cir.2003) ("[T]he [New York] test is not contrary to the *Strickland* test for purposes of § 2254(d)(1)."); *see also Baskerville v. Dennison,* No. 04 Civ. 10261(PKC), 2005 WL 3535067, at *7 (S.D.N.Y. Dec.27, 2005).[10] Thus, the Court's analysis under

10. A recent Second Circuit opinion has called this holding into question. The New York standard for ineffective assistance of counsel is a flexible standard under which the state court considers "whether the defendant received 'meaningful representation' based on the 'totality' of the circumstances in the case, and whether the defendant has shown 'prejudice [based] on the fairness of the process as a whole rather than [any] particular impact on the outcome of the case.' " *Henry,* 409 F.3d at 57. In *Henry,* the Second Circuit found that the New York standard, insomuch as "whether defendant would have been acquitted of the charges but for counsel's errors is

... not dispositive," contrary to the *Strickland* principle that ineffective assistance is established if there is a reasonable probability that but for counsel's professionally deficient performance, the outcome of the proceeding would have been different. *See id.* at 71. This distinction does not appear to be implicated by the Appellate Division's decision in this case. The Appellate Division did not rest its holding on defense counsel providing competent representation overall, despite any errors in representation. Rather, the Appellate Division found that defense counsel did not commit any error in failing to move to sup-

AEDPA is limited to whether the Appellate Division unreasonably applied *Strickland*.

The Appellate Division examined the suppression hearing record, and held that defense counsel was not ineffective because, if a motion had been made to suppress the confirmatory identifications, it would not have been successful. *See Massillon*, 289 A.D.2d at 103, 734 N.Y.S.2d at 163. It further reasoned that Petitioner could not have been prejudiced because the People would have established that the officers possessed, at the very least, reasonable suspicion upon which to detain defendant pending the confirmatory identifications. *See id.* The Appellate Division concluded that "[Petitioner] fit a description of the seller that was sufficiently specific, given the temporal and geographic factors, to establish reasonable suspicion." *Id.* at 104, 734 N.Y.S.2d at 163.

Petitioner argues that the reasoning of the Appellate Division is deeply flawed, since once the prosecution conceded, and the hearing court concluded, that Petitioner had been arrested, rather than merely stopped, the "reasonable suspicion" standard was inapplicable. (*See* Pet.'s Mem. at 26–27.) The Court agrees. The trial court had suppressed the evidence found on Petitioner as the fruit of an illegal arrest. Had defense counsel moved to have the confirmatory identifications similarly suppressed, there can be little doubt

that the motion would have been successful.[11] What the police could have done had Petitioner not been arrested, and simply detained based on reasonable suspicion, is therefore irrelevant. *See Ceballos*, 654 F.2d at 181 (noting that once the court determined that defendant's arrest was not supported by probable cause, it need not consider whether there would have been articulable reasons for subjecting defendant to an investigatory stop).

That the Appellate Division's decision was clearly unreasonable is further reflected in its characterization of the undercover officers' extraordinarily vague descriptions of the seller as "sufficiently specific" to establish reasonable suspicion. *See Massillon*, 289 A.D.2d at 104, 734 N.Y.S.2d at 163. Moreover, by crediting the "temporal and geographic factors" in this case as supporting a conclusion of reasonable suspicion, *see id.*, the Appellate Division appears to have completely ignored the discrepancies in the officers' testimony about the timing and geographic proximity of the arrest to the time and location of the "buy." Indeed, it stretches the imagination to connect the Appellate Division's description of its basis for finding reasonable suspicion with the facts elicited at Petitioner's suppression hearing and at trial.

Having found that (1) the officers' confirmatory identifications would likely have

---

press the confirmatory identifications, because it concluded that the identifications were not suppressible. *See Massillon*, 289 A.D.2d at 103, 734 N.Y.S.2d at 163. In any event, if the Appellate Division relied solely on New York law, and it was in contravention of the *Strickland* standard, its decision would not be entitled to any deference under AEDPA.

11. Petitioner was confronted by several officers, shouting "police" and "freeze," and Petitioner was then handcuffed, lifted onto the hood of a car, searched, and walked approxi-

mately seventy-five yards to the corner of 93rd Street and West End Avenue. There can be no question that he was arrested. *See* discussion *supra* at 395–97; *see also Moreno*, 897 F.2d at 31 (holding that by pushing defendant against a wall and telling him not to move, defendant's detention was transformed into an arrest); *Dallas v. Goldberg*, No. 95 Civ. 9076(WHP), 2000 WL 1092986, at *6 (S.D.N.Y. Aug.4, 2000) (holding that plaintiff was arrested when he was approached by officers with guns drawn, pinned to the ground, and handcuffed).

been suppressed as the fruits of an illegal arrest; and (2) that if the confirmatory identifications had been suppressed, there is a reasonable likelihood that the outcome of Petitioner's trial would have been different, the Court concludes that the Appellate Division unreasonably applied *Strickland* when it denied Petitioner's ineffective assistance of counsel claim on the basis that defense counsel would not have been able to obtain suppression of the confirmatory identifications. The confirmatory identifications were clearly suppressible under both state and federal law, and defense counsel's failure to move for their suppression fell below an objective standard of reasonableness. Because the confirmatory identifications were never challenged, the prosecution was able to present a case which relied heavily on unlawful identification evidence, as demonstrated by the prosecutor's summation and the jury's question during deliberations. In addition, in all likelihood, the in-court identifications would have been suppressed had defense counsel not lost the opportunity to make such a motion. Thus, the deficient performance of defense counsel prejudiced Petitioner, because if defense counsel had secured the suppression of the confirmatory identifications, and attempted suppression of the in-court identifications, there is a reasonable probability that Petitioner would not have been convicted.

For the above reasons, the Court concludes that the Appellate Division's rejection of Petitioner's ineffective assistance of counsel claim unreasonably applied the *Strickland* standard, and thus is not entitled to deference under AEDPA.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that the Petition be granted.[12]

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Sidney H. Stein, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Stein. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

May 1, 2006

---

**12.** It is unclear whether Petitioner would be subject to release from custody upon the granting of the Petition, since he is also serving a concurrent sentence on another charge.